UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY JANINE KRYCIA,                          Case No. 13-13659

              Plaintiff,                    Matthew F. Leitman

v.                                           United States District Judge

TOWNSHIP OF CLINTON, *et al*,                Michael Hluchaniuk
                                             United States Magistrate Judge

              Defendants.
_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Dkts. 35 and 37)

## I.   PROCEDURAL HISTORY

Plaintiffs Mary Janine Krycia and Patricia Newell filed this wrongful

termination action against their former employer, Clinton Township, and their

former supervisor, George Fitzgerald, alleging retaliatory discharge in violation of

their First Amendment rights.[1] (Dkt. 1). Defendants Clinton Township and former

Township Clerk Fitzgerald each filed motions for summary judgment on August

31, 2015. (Dkts. 35, 37). Plaintiffs filed a response to defendants' motions on

September 21, 2015. (Dkt. 42). These motions were referred on September 22,

2015. (Dkt. 58). Defendant Fitzgerald filed his reply brief in support of his motion

_____

[1] The Court refused to exercise supplemental jurisdiction over plaintiffs'
state law claims and thus dismissed the other counts of plaintiffs' complaint. (Dkt.
4).

1

on October 7, 2015 and defendant township filed its reply brief on October 8, 2015. (Dkts. 60, 63). On November 16, 2015, plaintiffs and defendant Fitzgerald filed their Joint Statement of Resolved/Unresolved Issues Regarding Defendant Fitzgerald's Motion for Summary Judgment (Dkt. 35). (Dkt. 69). On November 24, 2015,[2] plaintiffs and defendant Clinton Township filed their Joint Statement of Resolved/Unresolved Issues Regarding Defendant Township's Motions for Summary Judgment (Dkt. 37). (Dkt. 70). On November 30, 2015, plaintiffs, without leave from the Court, filed a supplemental brief in response to defendants' motions for summary judgment. (Dkt. 71).[3]

After hearing the parties' arguments on December 2, 2105, the matter was taken under advisement.  For the reasons set forth below, the undersigned recommends that defendants' motions for summary judgment be **GRANTED** and plaintiffs' complaint be **DISMISSED**.

## II.    FACTUAL BACKGROUND

 Defendant George Fitzgerald ("Fitzgerald") served as the elected Clinton Township Clerk from 2008 until November, 2012, when he was defeated by the

---

[2]This Joint Statement was untimely filed pursuant to this Court's Scheduling Order and Order Requiring Compliance with Local Rule 7.1, which required Joint Statements be filed by November 16, 2015. (Dkt. 59).

[3]The supplemental brief does not comply with this Court's Scheduling Order or Local Rule 7.1 and thus shall not be considered.

current Township Clerk Kimberly Meltzer. (Dkt. 35, Pg  ID 177).

A.    Plaintiff Newell

Plaintiff Patricia Newell ("Newell") was Elections Coordinator for the Clerk's office, an appointed position to which Fitzgerald reappointed her in 2008, until she took early retirement, effective July 31, 2012. (Dkt. 35, 42).

On the eve of a school board election in May 2011, a dispute arose between Newell and Fitzgerald regarding five laptop computers, which served as poll books for Clinton Township (the "Township"). (Dkt. 42, 35-3). Fitzgerald wanted to take these computers home with him, but Newell believed doing so to be unethical and in violation of state election law. (*Id.*)  Fitzgerald took the computers home, but was unable to access them because he did not have the encryption password. (*Id.*) According to Newell, she did not have access to the passwords, but Fitzgerald blamed her for not providing him with them and threatened her job if the "election did not go right." (*Id.*) That day, Newell suffered an anxiety attack for which she was ultimately hospitalized. (*Id.*).

On May 11, 2011, an article appeared in the Fraser-Clinton Township Chronicle entitled **"SLOW DAY REPORTED AT CLINTON TOWNSHIP POLLS."** (Dkt. 35-12, 42). Newell made three statements that were quoted in the article: **"Last night, we were able to update our data with our electronic poll books, and when we looked at the numbers, it was frightening," "I've been**

**here 20 years, and this was low,"** and **"Lately, that's the way it's been going."**
(*Id.*, emphasis supplied). According to Newell, the reporter repeatedly called to
talk to Fitzgerald or Deputy Clerk Irvine, but they would not speak with her. (Dkt.
35-3, Pg. ID 271-73).  Newell was given the call and she asked the reporter not to
quote her because it was just her opinion. (*Id.*) When the reporter asked Newell for
a quote that she could print, Newell gave her the election results. (*Id.*) Newell was
not told by Fitzgerald or Irvine to refrain from speaking to the press. (*Id.*) Plaintiff
made the quotes attributed to her by the Chronicle and also said that the majority
of the voters made their decision by absentee ballots; that of the four thousand
nine hundred thirty five ballots cast, only nine hundred and forty-eight of them
were cast in person. (*Id.*) Newell's remarks were made on the day after the
election. (*Id.*)

The next day after the article appeared in the Chronicle, Fitzgerald called
Newell into his office, asked her why she was talking to the media and told her:
**"that's my job and everything is supposed to go through my office."** (Dkt. 42,
emphasis supplied). Newell was not aware of any claimed policy of the Clerk's
office that communications with the media regarding election matters came from
him and not his employees. (Dkt. 35-3, Pg. ID 271-73). According to Newell, she
received  a written reprimand for talking to the newspaper reporter. (*Id.*) Newell
wrote a letter to Fitzgerald indicating that she wouldn't speak to anyone from the

media that states in part as follows:

> **I Patricia Jo Newell truly apologize for the article written by Heidi Roman of the Fraser-Clinton Chronicle, I thought the call was being transferred to you, as Clerk of the Township, never did I think my opinion or text would be considered an interview. This will NEVER happen again, as I have great respect for this Township, Clerk and the democratic process. . . . Mr. Fitzgerald I am a team player, and take great pride in my job, work ethics and integrity. Again this will NEVER happen again."**

(Dkt. 46; emphasis supplied).

On July 7, 2011, Fitzgerald asked Newell to sign a letter of recommendation for his wife Julie. (Dkt. 1) Fitzgerald told Newell  that his wife, Julie, was in the office because there was an Elections Coordinator position opening up in Macomb Township. (Dkt. 42, 35-3). Plaintiff initially wrote a letter of recommendation for Julie, stating that she would be a good candidate for the position. (Dkt. 35-3. Pg. ID 274-75). However, Fitzgerald then asked her to sign a different letter, on Deputy Clerk Irvine's letterhead, stating that Julie was highly qualified to be an Elections Coordinator. (*Id.*) Newell was concerned about signing this letter because she did not know if Julie was qualified for the position and because the letter's suggestion that the position could be learned in one week was not true. (*Id.*) Newell told Fitzgerald several times that she did not want to sign the letter. (*Id.*) Fitzgerald told Newell that if she didn't sign the letter she would be out on Romeo Plank Road. (*Id.*) Fitzgerald also told Newell if you want your job sign the

letter. (*Id.*) Newell ultimately did sign the letter, but testified that she later informed the  Macomb Township Elections Supervisor that she had been coerced into signing the letter of recommendation. (Dkt. 35-3, Pg. ID 276).

In August 2011, Newell was issued a written reprimand for making inappropriate comments to other township employees, including negative comments about Fitzgerald and Irvine.  (Dkt. 51). The reprimand indicates it relates to incidents which occurred on July 26, 2011, and directs Newell to report to the Employee Assistance Program as discipline for her conduct.  (*Id.*)  It notes Newell's stated concern that the investigation resulting in the reprimand was an effort to get rid of and discredit her, but also states that the reprimand does not alter her employment status with the Township. (*Id.*)

On November 23 and 28, 2011, articles appeared in the Macomb Daily that portrayed Fitzgerald in a negative light by labeling him a bully and stating that he carried a gun to work. (Dkt. 52, Pg. ID 1515-16). Fitzgerald blamed Newell for the Macomb Daily article about bullying. (Dkt. 37-2, Pg. ID 509). Fitzgerald wanted Newell to go to the Macomb Daily to say that she had nothing to do with the article. (*Id.*). Fitzgerald had Deputy Clerk Irvine write a letter that his employees were to sign to send over to the Macomb Daily. (Dkt. 44, Pg. ID 1479). Fitzgerald presented Newell with a letter that he prepared to submit to the Macomb Daily regarding the articles. (Dkt. 37-2, Pg. ID 513). Newell had to sign a letter stating

that she had no knowledge of the articles in the paper, that she had never filed complaints with the HR department and that she did not disclose any information regarding the Clerk or his office. (Dkt. 53). Newell also confirmed in this letter that she had nothing to do with the articles in the Macomb Daily. (*Id*.) Newell, and the other Clerk's office employees, signed the letter at the direction of Fitzgerald. (Dkt. 44, Pg. ID 1479). According to Newell, she was written up by Deputy Clerk Irvine for the article that appeared in the Macomb Daily. (Dkt. 37-2, Pg. ID 509).

In May 2012, Fitzgerald's secretary filed a complaint of harassment against Fitzgerald, which was publicized in a number of local newspaper articles. (Dkt. 55).  Newell went to the Township HR department to report that she was concerned about her safety because Fitzgerald carried a gun. (Dkt. 42, 35-3). Newell, Krycia, and the other Clerk's office employees were concerned about coming to work because they felt Fitzgerald was going to be very upset after he received his assistant's complaint. (*Id.*) Deputy Clerk Irvine had a meeting on May 23, 2012 during which she told the Clerk's employees that two people had to be in the office at all times and no one could walk out of the building alone or go to lunch.  (Dkt. 42, 35-4). Someone at that meeting said she wouldn't be surprised if George would show up with a gun because he had been so unpredictable that day. (*Id.*) As a result, none of Fitzgerald's employees reported to work on the Friday after the article in the newspaper appeared. (Dkt. 42, 35-2). A sheriff's deputy was

7

assigned to the Clerk's office for one day. (Dkt. 42, 44). According to Newell, because of the hostile work environment and the stress that it caused her, she retired from the Township, effective July 31, 2012. (Dkt. 35-19).

> B.    Plaintiff Krycia

Plaintiff Mary Janine Krycia ("Krycia") was an Elections Clerk from 2000, until May 23, 2012, the date she last worked before taking a leave of absence for medical reasons. (Dkt. 35, 42). Krycia's employment was ultimately terminated on April 9, 2013, by new Township Clerk Meltzer, after Krycia exhausted all leave time and refused to return to work. (Dkt. 35, 42).

On May 12, 2011, Fitzgerald also yelled at Krycia about the May 11, 2011 article in the Chronicle. (Dkt. 37-3, Pg. ID 619) Fitzgerald told Krycia that Newell was quoted in the paper but, in fact, Krycia didn't know what the quotes were at the time. (*Id.*) Fitzgerald asked Krycia if she knew about the article and told her that she should have because she's friends with Newell. (Dkt. 37-3, Pg. ID 620) Fitzgerald was very threatening to Krycia and threw the newspaper at her. (Dkt. 37-3, Pg. ID 619-620). Fitzgerald asked Krycia to sign a letter dated May 13, 2011 indicating that she had no knowledge of the newspaper article regarding the May 3, 2011 school election, that she understood that all media calls are to be answered by Fitzgerald as the Clerk of the Township and that she would forward any such calls to him immediately. (Dkt. 47, Pg. ID 1500). Krycia's letter also states that

8

she likes working for the Election Department in Clinton Township as part of Fitzgerald's staff, that she is a team player and that she will continue to be a dedicated and conscientious employee of the Township. (*Id.*)

Fitzgerald presented Krycia with the same letter to the Macomb Daily he prepared for Newell's signature.  Krycia also signed the letter stating that she had no knowledge of the articles in the paper, that she had not ever filed complaints with the HR department and that she did not disclose any information regarding the Clerk or his office. (Dkt. 53, Pg. ID 1518). According to Newell, Krycia was also written up by Deputy Clerk Irvine for the article that appeared in the Macomb Daily. (Dkt. 37-2, Pg. ID 509). Krycia left the Clerk's office on May 23, 2012 for medical reasons, never returned to work and was dismissed by Fitzgerald's successor after a hearing and subsequent determination that she had abandoned her position. (Dkt. 35-5, 35-9, 35-11).

## III.   ANALYSIS

### A.   Standard for Summary Judgment

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323, 106 S. Ct. at 2553. Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. See *Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1). The court must accept as true the non-movant's evidence

and draw "all justifiable inferences" in the non-movant's favor. See *Liberty Lobby*, 477 U.S. at 255, 106 S. Ct. at 2513.

 B. <u>First Amendment Retaliation</u>

 A prima facie case of First Amendment retaliation requires evidence that: 1) plaintiff was engaged in protected speech or expression; 2) plaintiff was subjected to an adverse action sufficient to chill an ordinary person from engaging in protected speech or expression; and 3) plaintiff's protected speech or expression was the motivating factor for the adverse action. *Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Ville Sch. Dist.*, 624 F.3d 332, 337 (6th Cir. 2010). The government, as employer, has greater latitude to control First Amendment rights of speech and expression. *Connick v. Myers*, 461 U.S. 138, 143, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). A public employee bears the burden of demonstrating that each of the following three elements are present. *Evans-Marshall*, 624 F.3d at 337.

1. The First Amendment protects the speech of public employees only when it involves "matters of public concern." *Id* (citing *Connick,* 461 U.S. at 143). An employee's speech touches on a matter of public concern when it addresses political, societal or other community concerns. A court analyzes the speech by its content, context and forum. *Id.*

2. The speech in question must be uttered "as a citizen," and not simply public employees making statements pursuant to their official duties. *Garcetti v.*

11

*Caballos*, 547 U.S. 410, 421-424,126 S. Ct. 1951, 1960-61, 164 L. Ed. 2d 689 (2006). Speech which owes its existence to an employee's professional responsibilities is not made "as a citizen." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544-45 (6th Cir. 2007).

3.   A balancing test is required to weigh the employees speech against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Evans-Marshall*, at 332(quoting *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35, 20 L. Ed. 2d 811)). The court considers the following governmental interests in performing the balancing test:

a.   Whether the employee's statement impairs discipline by supervisors or harmony among coworkers.

b.   Whether the employee's statement has a detrimental impact on close working relationships for which personal loyalty and confidences are necessary.

c.   Whether the employee's statement impedes the performance of the employee's duties or interferes with the regular operations of the enterprise.

*Pickering*, 391 U.S. 570-573. The question of whether a public employee's speech is protected by the First Amendment is one of law for the court to decide. *Fox v.*

12

*Traverse City Schools Bd. of Educ.*, 605 F.3d 345, 350-51 (6th Cir. 2010); *see also, See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007) (citing *Connick*, 461 U.S. at 148)); *Haynes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007); *Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003).

If a public employee speaks pursuant to employment responsibilities, and not "as a citizen," the district court need not address whether the employee's speech touched on matters of public concern. *Weisbarth*, 499 F.3d at 546-47 (citing *Mills v. City of Evansville,* 452 F.3d 646, 647-48 (7th Cir. 2006)(*"Garcetti* ... holds that before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking "as a citizen" or as part of her public job. Only when government penalizes speech that a plaintiff utters "as a citizen" must the court consider the [Connick/Pickering analysis].")).

      1.    <u>Protected Speech</u>

          a.    Newell

Newell argues that her objections to Fitzgerald taking the poll book laptops out of the Clerk's Office, her statements regarding voter turnout quoted in the Fraser-Clinton Township Chronicle in May, 2011 and her opposition to signing a letter of recommendation for Fitzgerald's wife was protected speech she made "as a citizen." (Dkt. 69). Newell contends that it was not her job responsibility to

13

speak to the media, so her comments to the press were made "as a citizen." (Dkt. 69, 70). Likewise, she asserts that her comments regarding unethical conduct by the Township Clerk were not undertaken in the course of performing her job, and thus were protected speech under *Springsteen v. Garrett*, 885 F. Supp. 2d 835, 845 (E.D. Mich. 2012). (Dkt. 70). Newell also asserts that, according to *Majcharzak v. Wayne Cty.*, 838 F. Supp. 2d 586 (E.D. Mich. 2011), it is irrelevant that her comments conveyed knowledge gained through her employment. (Dkt. 69). Defendants argue that Newell's comments were all made pursuant to her official duties as Elections Coordinator and thus she was not speaking "as a citizen" for First Amendment purposes. (Dkt. 69, 70).

As noted above, to be protected by the First Amendment, the speech in question must not be simply public employees making statements pursuant to their official duties. *Garcetti*, 547 U.S. at 421-424. Taking action against a public employee for speech made pursuant to official duties might give rise to anti-discrimination, whistleblower, or labor-contract claims, but it does not violate the First Amendment. *Weisbarth*, 499 F.3d at 546.

> Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.

14

*Garcetti*, 547 U.S. at 422-423.   The *Garcetti* Court acknowledged the difficulty of pinning down static job descriptions and explained that formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes. *Weisbarth*, 499 F.3d at 544. Thus, speech by a public employee made pursuant to ad hoc or de facto duties not appearing in any written job description is nevertheless not protected if it "owes its existence to [the speaker's] professional responsibilities." *Fox*, 605 F.3d at 348-49(quoting *Weisbarth*, 499 F.3d at 544). Ths Sixth Circuit has held repeatedly that public employees voicing disagreement with or criticism of management's policy, particularly if they are voicing those complaints directly to their supervisors, are doing so pursuant to their official duties and that these statements owe their existence to the speaker's professional responsibilities. *See e.g., Fox*, 605 F.3d at 348-49; *Weisbarth*, 499 F.3d at 544; *Haynes*, 474 F.3d at 364; *see also, Hilden v. Hurley Medical Center*, 831 F. Supp. 2d 1024, 1039 (E.D. Mich. 2011)(complaints to supervisors and other hospital personnel were deemed not protected but same complaints to outside regulatory agency were deemed protected).

As in those cases, it is clear that Newell voiced her concerns to her

15

immediate supervisor, Fitzgerald, regarding the propriety of removing the poll book laptops from the Clerk's office on the eve of an election pursuant to her official duties as Elections Coordinator. Similarly, Newell's objections, again directed to Fitzgerald, to signing a letter of recommendation for an election official position for his wife based on her questionable qualifications for that position were an articulation of Newell's disagreement with her boss' directive, and thus owe their existence to her professional responsibilities.[4]

In her argument that these complaints to her supervisor were indeed protected speech, Newell relies on *Springsteen*, 885 F. Supp. 2d at 845. Nevertheless, Newell's reliance on *Springsteen* is misplaced. The *Springsteen* court determined that comments made by the Deputy Chief of Staff of the Wayne County Clerk to the Internal Affairs office regarding potential corruption in the county clerk's office were protected speech because the comments were made to a law enforcement agency, an entity distinct from his employer, in cooperation with a criminal investigation of his employer. *Id*. *Springsteen* explicitly distinguishes itself from cases such as this one, where employees' complaints and concerns

---

[4]Notably, Newell does not argue that her alleged comments to the Macomb Township's Election Supervisor disavowing the recommendation of Fitzgerald's wife for a position there are protected speech; although Newell testified to calling Macomb Township's Election Supervisor, she does not point to any evidence that Fitzgerald or the Township were aware that she made these comments. (Dkt. 35-3, Pg. ID 276).

about job duties, directed specifically to a supervisor, were deemed to have been undertaken in the course of performing their jobs and thus not protected under the First Amendment. *Id.* (citing *Fox*, 605 F.3d at 349). Unlike the plaintiff in *Springsteen*, Newell issued complaints about the propriety of Fitzgerald's directives specifically to Fitzgerald, her supervisor. Thus, Newell's concerns about the letter of recommendation, raised "up the chain of command at [her] workplace about [her] job duties..." were undertaken in the course of performing her job, and not made "as a citizen." *Springsteen*, 885 F.Supp.2d at 845(quoting *Fox*, 605 F.3d at 349).  Accordingly, these comments are unprotected speech.

Newell's comments to the press were obviously not made to her supervisor, but they were made pursuant to her ad hoc official duties.  According to Newell's own testimony, her comments to the reporter were made when the reporter called the Clerk's office, seeking official comment on the election. (Dkt. 35-3, Pg. ID 271-73). Newell asserted that she spoke to the reporter, and thus made the statements at issue, only after the reporter repeatedly called for Fitzgerald and Deputy Clerk Irvine, who were unavailable or refused to take the call. (*Id.*). Newell testified that she believed that if the Clerk or the Deputy Clerk did not speak to the press, the task fell to her as the Elections Coordinator. (Dkt. 35-3. Pg. ID 272). Accordingly, she made her comments regarding elections results and voter turnout as part of what she believed to be her official duties.  That her belief

was as at odds with what her supervisors believed her duties to be does not convert her comments into protected speech. She made her comments in her capacity as Elections Coordinator, to a reporter who called the Clerk's office seeking the Clerk's official response to the election. *Contra Majchrzak*, 838 F. Supp. 2d at 595(sewage pump station employee made protected comments relating to the pump station at a city budget meeting while on vacation and after introducing himself as a citizen of the community). Considering both its content (voter turnout) and context (in response to media's request for official comment on election result), Newell's statements owe their existence to her professional responsibilities and thus cannot be deemed protected speech. *See Fox*, 605 F.3d at 348(in reviewing a public employee's statement under *Garcetti*, we must consider both its content and context...to determine whether the plaintiff made the statement pursuant to her individual duties).

> **b.**   **Krycia**

Krycia argues that her right to refrain from signing letters regarding lack of knowledge of Newell's comments to the Chronicle and the accounts of Fitzgerald's bullying that was the subject of the Macomb Daily articles was protected speech she made "as a citizen" because it is undisputed that it was not part of her official duties to speak or refrain from speaking about voter turnout or the conduct of the Township Clerk. (Dkt. 70). Krycia argues that employee First

18

Amendment rights include the right to refrain from speaking. Defendants argue that Krycia did not engage in any protected activity because she did not refrain from signing the letters she was asked to sign. (Dkt. 69).

Although Krycia is correct in noting that the First Amendment protects the ability to refrain from speech, *Langford v. Lane*, 921 F.2d 677 (6th Cir. 1991), Krycia did not refrain from speech; she acquiesced in her supervisor's direct orders to prepare and/or sign both the memo disavowing involvement in Newell's comments to the Chronicle, and the letter denying any knowledge of the information relayed in the Macomb Daily articles. (Dkt. 37-3).  Accordingly, there is no genuine issue of material fact that Krycia did not engage in the activity she argues is protected.

2.   Speech Motivating Factor For Adverse Action

To survive a motion for summary judgment in a First Amendment retaliation matter, an employee must demonstrate that the speech at issue represented a substantial or motivating factor in the adverse employment action. *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003).

An adverse employment action is a "materially adverse change in the terms or conditions of...employment because of [the] employer's conduct. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). The term "adverse action" has traditionally referred to discharge, demotion, refusal to hire, non-

19

renewal of contracts, and failure to promote. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 742 (6th Cir. 2010). Criticisms, accusations, threats or badmouthing by an employer do not constitute adverse employment action. *Mills v. Williams*, 476 F.Supp.2d 653, 662 (E.D.Mich. 2007), *aff'd* 276 Fed. App'x 417 (6th Cir. 2008).

Specifically, the employee must "point to specific, nonconclusory allegations reasonably linking her speech" to the adverse action. *Id*(quoting *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 602 (6th Cir. 2002), *abrogated on other grounds by White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232 (6th Cir. 2005)). The fact that an adverse employment action occurred after the exercise of free speech, without more, is insufficient to establish the link that is central to a First Amendment retaliation claim. *Farmer*, 295 F.3d at 602 (citing *Bailey v. Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 144-45 (6th Cir. 1997)). When opposing a motion for summary judgment, the nonmoving party may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent. Rather, the employee must link the speech in question to the defendant's decision to dismiss her. *Id*.

Neither Newell nor Krycia have presented evidence reasonably linking their speech to adverse action by defendants. Although Newell may have been reprimanded by Fitzgerald for speaking with the Chronicle reporter in May 2011,

20

over fourteen months before her retirement, she was not discharged, demoted or

suspended and she did not lose responsibilities, pay or benefits. (Dkt. 37-2, Pg. ID

536). Likewise, the internal investigation of Newell in August 2011 did not result

in any discipline, suspension, demotion, discharge, loss of pay, benefits or

responsibility. (*Id.*). Moreover, defendants maintain that the August 2011

investigation of Newell arose from her colleagues' complaints about her

workplace conduct, and not any of her comments regarding the election or the

letter of recommendation. Most notably, Newell testified that she sought early

retirement in July 2012 because of a "hostile work environment" caused by her co-

workers. (Dkt. 35-19; 37-2. Pg. ID 526-527).

Newell again relies on *Springsteen* in arguing that the disciplinary action

imposed in August 2011 constitutes adverse action by her employer. In

*Springsteen,* the court determined that the plaintiff had presented evidence, in the

form of comments from plaintiff's supervisor about desiring plaintiff's removal, a

reprimanding memo expressing his supervisor's displeasure regarding his

comments to Internal Affairs, and the sudden onset of memos critical of plaintiff's

job performance beginning only after he spoke to IA, to raise a genuine issue of

material fact that he faced adverse action from his employer in retaliation for his

comments to IA and not as a result of his alleged mismanagement.

Newell argues that the letter she wrote apologizing for her comments to the

Chronicle reporter[5] is analogous to the memo expressing displeasure over the plaintiff's comments to IA that he signed in *Springsteen*. (Dkt. 42, 46). Newell also contends that the August 2011 investigation and resulting reprimand are akin to the critical memos in plaintiff's personnel file, occurring only after plaintiff's offending speech. (Dkt. 42). Newell's arguments overlook a crucial difference between the *Springsteen* plaintiff's situation and her own: the plaintiff in *Springsteen* was suspended for three days without pay, and ultimately terminated from his position with defendant county. *Springsteen*, 885 F. Supp. 2d at 841. Suspension and termination are unarguably adverse actions by an employer. *See Fritz*, 592 F.3d at 742. In this case, defendants' censure of Newell did not culminate in termination, suspension or any other employment event which could be considered an adverse action. *See id*.

The *Springsteen* court considered the defendant's reprimanding memo and comments about wanting to remove plaintiff from the clerk's office, along with job performance criticism arising only after plaintiff's offending speech, not as evidence of the existence of an adverse action (an issue not in controversy in the *Springsteen* case), but rather as evidence that the adverse action, i.e., plaintiff's termination, was motivated by retaliatory animus. *Springsteen* 885 F. Supp. 2d at

---

[5]Newell does not advance any evidence that she was instructed to write this letter by Fitzgerald or anyone else. (Dkt. 42).

846-47. The undersigned does not read *Springsteen* to hold or even to suggest that a reprimanding memo, a comment expressing a supervisor's desire to remove an employee or a series of memos criticizing an employee's job performance, are, in and of themselves, adverse employment actions. Accordingly, even if, *arguendo*, there are similarities between Newell's letter of apology and Springsteen's signed memo, or the suspicious eruption of job performance criticism in *Springsteen* and the August 2011 investigation of Newell, those similarities are not meaningful in the absence of a termination or other adverse employment action.

Similarly, Krycia has not presented evidence of any adverse action by her employer. Krycia was never disciplined, suspended or demoted and her duties, pay and benefits were never reduced. (Dkt. 35-4, Pg. ID 376). She left her employment for medical reasons after experiencing a panic attack in May 2012, thirteen months after the Chronicle episode and six months after the Macomb Daily articles. (Dkt. 35-4. Pg. ID 390-91). Tension in the Clerk's office was running high as a result of a HR investigation of a complaint against Fitzgerald by his secretary. *Id*. During a Township Board meeting, Krycia allegedly overheard a comment that it would not be a surprise "if Mr. Fitzgerald came to the Clerk's Office shooting up the place." (*Id.).*  She left work on medical leave the following day and did not return, even after she had been found fit to return to work by way of an independent psychiatric evaluation, Fitzgerald was ousted in the November

23

2012 election, she exhausted all of her sick, vacation and personal leave and she was duly notified of dismissal if she failed to return to work. *Id;* (Dkt. 35-5, 35-9, 35-11).

Because neither plaintiff can establish an adverse employment action on the part of the defendants, they obviously cannot identify any evidence, let alone specific, nonconclusory evidence, connecting their speech (even if it were deemed protected) with any adverse employment action. Thus, the undersigned finds that their retaliation claims fail as a matter of law and summary judgment in favor of defendants is appropriate.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendants' motions for summary judgment be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health*

*and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: December 16, 2015    s/Michael Hluchaniuk
            Michael Hluchaniuk
            United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

I certify that on <u>December 16, 2015</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

<div style="margin-left:40%">

<u>s/Tammy Hallwood</u>
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov

</div>