UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY JANINE KRYCIA *et al.*,

      Plaintiffs,                        Case No. 13-cv-13659
                                              Hon. Matthew F. Leitman

      v.

TOWNSHIP OF CLINTON *et al.*,

      Defendants.

_____/

## OPINION AND ORDER (1) OVERRULING PLAINTIFFS' OBJECTIONS TO REPORT AND RECOMMENDATION (ECF #73); (2) ADOPTING IN PART REPORT AND RECOMMENDATION (ECF #72), AND (3) GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF ## 35, 37)

In this action brought under 42 U.S.C. § 1983, Plaintiffs Mary Janine Krycia ("Krycia") and Patricia Newell ("Newell") (collectively, "Plaintiffs") allege that their former employer, Defendant Township of Clinton (the "Township"), and the Township's former clerk, Defendant George Fitzgerald ("Fitzgerald") (collectively, "Defendants"), retaliated against them for exercising their First Amendment rights. Following the close of discovery, the Defendants each moved for summary judgment (the "Motions"). (*See* ECF ## 35, 37.) The Defendants argued that neither Krycia nor Newell had engaged in speech protected under the First Amendment and that neither Plaintiff faced an adverse action as a result of any protected speech. In a Report and Recommendation dated December 16, 2015

1

(the "R&R"), the assigned Magistrate Judge agreed with the Defendants and recommended that the Court grant summary judgment in favor of the Defendants. (*See* R&R, ECF #72 at 2, Pg. ID 1777.)  Plaintiffs filed timely objections to the R&R (the "Objections") (ECF # 73), and Defendants responded to the objections (ECF ## 74, 75).  For the reasons explained below, the Court **OVERRULES** the Objections, **ADOPTS IN PART** the R&R, and **GRANTS** the Motions.

## FACTUAL BACKGROUND

Plaintiffs have not objected to the factual recitation in the R&R.  The Court finds the recitation to be accurate and adopts it.   For ease of reference, the recitation provides as follows:

> Defendant George Fitzgerald ("Fitzgerald") served as the elected Clinton Township Clerk from 2008 until November, 2012, when he was defeated by the current Township Clerk Kimberly Meltzer. (Dkt. 35, Pg. ID 177).
>
> A.   Plaintiff Newell
>
> Plaintiff Patricia Newell ("Newell") was Elections Coordinator for the Clerk's office, an appointed position to which Fitzgerald reappointed her in 2008, until she took early retirement, effective July 31, 2012. (Dkt. 35, 42). On the eve of a school board election in May [2010], a dispute arose between Newell and Fitzgerald regarding five laptop computers, which served as poll books for Clinton Township (the "Township"). (Dkt. 42, 35-3). Fitzgerald wanted to take these computers home with him, but Newell believed doing so to be unethical and in violation of state election law. (*Id.*) Fitzgerald took the computers home, but was unable to access them because he did not have the encryption password. (*Id.*) According to Newell, she did not have access to the passwords, but Fitzgerald blamed her for not providing him

2

with them and threatened her job if the "election did not go right." (*Id.*) That day, Newell suffered an anxiety attack for which she was ultimately hospitalized. (*Id.*)

On May 11, 2011, an article appeared in the Fraser-Clinton Township Chronicle entitled **"SLOW DAY REPORTED AT CLINTON TOWNSHIP POLLS."** (Dkt. 35-12, 42). Newell made three statements that were quoted in the article: **"Last night, we were able to update our data with our electronic poll books, and when we looked at the numbers, it was frightening," "I've been here 20 years, and this was low,"** and **"Lately, that's the way it's been going."** (*Id.*, emphasis supplied). According to Newell, the reporter repeatedly called to talk to Fitzgerald or Deputy Clerk Irvine, but they would not speak with her. (Dkt. 35-3, Pg. ID 271-73). Newell was given the call and she asked the reporter not to quote her because it was just her opinion. (*Id.*) When the reporter asked Newell for a quote that she could print, Newell gave her the election results. (*Id.*) Newell was not told by Fitzgerald or Irvine to refrain from speaking to the press. (*Id.*) Plaintiff made the quotes attributed to her by the Chronicle and also said that the majority of the voters made their decision by absentee ballots; that of the four thousand nine hundred thirty five ballots cast, only nine hundred and forty-eight of them were cast in person. (*Id.*) Newell's remarks were made on the day after the election. (*Id.*)

The next day after the article appeared in the Chronicle, Fitzgerald called Newell into his office, asked her why she was talking to the media and told her: **"that's my job and everything is supposed to go through my office."** (Dkt. 42, emphasis supplied). Newell was not aware of any claimed policy of the Clerk's office that communications with the media regarding election matters came from him and not his employees. (Dkt. 35-3, Pg. ID 271-73). According to Newell, she received a written reprimand for talking to the newspaper reporter. (*Id.*) Newell wrote a letter to Fitzgerald indicating that she wouldn't speak to anyone from the media that states in part as follows:

3

**I Patricia Jo Newell truly apologize for the article written by Heidi Roman of the Fraser-Clinton Chronicle, I thought the call was being transferred to you, as Clerk of the Township, never did I think my opinion or text would be considered an interview. This will NEVER happen again, as I have great respect for this Township, Clerk and the democratic process . . . . Mr. Fitzgerald I am a team player, and take great pride in my job, work ethics and integrity. Again this will NEVER happen again."**

(Dkt. 46; emphasis supplied).

On July 7, 2011, Fitzgerald asked Newell to sign a letter of recommendation for his wife Julie. (Dkt. 1) Fitzgerald told Newell that his wife, Julie, was in the office because there was an Elections Coordinator position opening up in Macomb Township. (Dkt. 42, 35-3). Plaintiff initially wrote a letter of recommendation for Julie, stating that she would be a good candidate for the position. (Dkt. 35-3. Pg. ID 274-75). However, Fitzgerald then asked her to sign a different letter, on Deputy Clerk Irvine's letterhead, stating that Julie was highly qualified to be an Elections Coordinator. (*Id.*) Newell was concerned about signing this letter because she did not know if Julie was qualified for the position and because the letter's suggestion that the position could be learned in one week was not true. (*Id.*) Newell told Fitzgerald several times that she did not want to sign the letter. (*Id.*) Fitzgerald told Newell that if she didn't sign the letter she would be out on Romeo Plank Road. (*Id.*) Fitzgerald also told Newell if you want your job sign the letter. (*Id.*) Newell ultimately did sign the letter, but testified that she later informed the Macomb Township Elections Supervisor that she had been coerced into signing the letter of recommendation. (Dkt. 35-3, Pg. ID 276).

In August 2011, Newell was issued a written reprimand for making inappropriate comments to other township employees, including negative comments about Fitzgerald and Irvine. (Dkt. 51). The reprimand indicates it relates to incidents which

occurred on July 26, 2011, and directs Newell to report to the Employee Assistance Program as discipline for her conduct. (*Id.*) It notes Newell's stated concern that the investigation resulting in the reprimand was an effort to get rid of and discredit her, but also states that the reprimand does not alter her employment status with the Township. (*Id.*)

On November 23 and 28, 2011, articles appeared in the Macomb Daily that portrayed Fitzgerald in a negative light by labeling him a bully and stating that he carried a gun to work. (Dkt. 52, Pg. ID 1515-16). Fitzgerald blamed Newell for the Macomb Daily article about bullying. (Dkt. 37-2, Pg. ID 509). Fitzgerald wanted Newell to go to the Macomb Daily to say that she had nothing to do with the article. (*Id.*). Fitzgerald had Deputy Clerk Irvine write a letter that his employees were to sign to send over to the Macomb Daily. (Dkt. 44, Pg. ID 1479). Fitzgerald presented Newell with a letter that he prepared to submit to the Macomb Daily regarding the articles. (Dkt. 37-2, Pg. ID 513). Newell had to sign a letter stating that she had no knowledge of the articles in the paper, that she had never filed complaints with the HR department and that she did not disclose any information regarding the Clerk or his office. (Dkt. 53). Newell also confirmed in this letter that she had nothing to do with the articles in the Macomb Daily. (*Id.*) Newell, and the other Clerk's office employees, signed the letter at the direction of Fitzgerald. (Dkt. 44, Pg. ID 1479). According to Newell, she was written up by Deputy Clerk Irvine for the article that appeared in the Macomb Daily. (Dkt. 37-2, Pg. ID 509).

In May 2012, Fitzgerald's secretary filed a complaint of harassment against Fitzgerald, which was publicized in a number of local newspaper articles. (Dkt. 55). Newell went to the Township HR department to report that she was concerned about her safety because Fitzgerald carried a gun.  (Dkt. 42, 35-3). Newell, Krycia, and the other Clerk's office employees were concerned about coming to work because they felt Fitzgerald was going to be very upset after he received his assistant's complaint . (*Id.*)  Deputy Clerk Irvine had a meeting on May 23, 2012 during which she told the Clerk's employees that two people had to be in the office at all times and no one could walk out of the

building alone or go to lunch.  (Dkt. 42, 35-4.)  Someone at that meeting said she wouldn't be surprised if George would show up with a gun because he had been so unpredictable that day.  (*Id.*)  As a result, none of Fitzgerald's employees reported to work on the Friday after the article in the newspaper appeared.  (Dkt. 42, 35-2).  A sheriff's deputy was assigned to the Clerk's office for one day.  (Dkt. 42, 44).  According to Newell, because of the hostile work environment and the stress that it caused her, she retired from the Township, effective July 31, 2012.  (Dkt. 35-19.)

B.   Plaintiff Krycia

Plaintiff Mary Janine Krycia ("Krycia") was an Elections Clerk from 2000, until May 23, 2012, the date she last worked before taking a leave of absence for medical reasons.  (Dkt. 35, 42.)  Krycia's employment was ultimately terminated on April 9, 2013, by new Township Clerk Meltzer, after Krycia exhausted all leave time and refused to return to work.  (Dkt. 35, 42.)

On May 12, 2011, Fitzgerald also yelled at Krycia about the May 11, 2011 article in the Chronicle.  (Dkt. 37-3, Pg. ID 619.)  Fitzgerald told Krycia that Newell was quoted in the paper but, in fact, Krycia didn't know what the quotes were at the time.  (*Id.*)  Fitzgerald asked Krycia if she knew about the article and told her that she should have because she's friends with Newell.  (Dkt. 37-3, Pg. ID 620.)  Fitzgerald was very threatening to Krycia and threw the newspaper at her.   (Dkt. 37-3, Pg. ID 619-20.)  Fitzgerald asked Krycia to sign a letter dated May 13, 2011 indicating that she had no knowledge of the newspaper article regarding the May 3, 2011 school election, that she understood that all media calls are to be answered by Fitzgerald as the Clerk of the Township and that she would forward any such calls to him immediately.  (Dkt. 47, Pg. ID 1500.)  Krycia's letter also states that she likes working for the Election Department in Clinton Township as part of Fitzgerald's staff, that she is a team player and that she will continue to be a dedicated and conscientious employee of the township.  (*Id.*)

Fitzgerald presented Krycia with the same letter to the Macomb Daily he prepared for Newell's signature.  Krycia also signed the

6

letter stating that she had no knowledge of the articles in the paper, that she had not ever filed complaints with the HR department and that she did not disclose any information regarding the Clerk or his office.  (Dkt. 53, Pg. ID 1518.) According to Newell, Krycia was also written up by Deputy Clerk Irvine for the article that appeared in the Macomb Daily. (Dkt. 37-2, Pg. ID 509.)  Krycia left the Clerk's office on May 23, 2012 for medical reasons, never returned to work and was dismissed by Fitzgerald's successor after a hearing and subsequent determination that she had abandoned her position. (Dkt. 35-5, 35-9, 35-11.)

## PLAINTIFFS' RETALIATION CLAIMS

### A.    Newell

Newell asserts that she engaged in three discrete acts of protected speech: (1) objecting to Fitzgerald taking home the Township's electronic poll books in May 2010 (the "Poll Book Opposition"), (2) objecting to signing a letter of recommendation stating that Fitzgerald's wife was qualified for an elections coordinator position in Macomb Township (the "Recommendation Letter Opposition"), and (3) making statements to the Fraser-Clinton Township newspaper, the *Chronicle*, regarding Clinton Township's May 2011 schoolboard election (the "Press Statements").  (*See* Pls.' Response Br., ECF #42 at 21, Pg. ID 1438.)

Newell claims that Defendants retaliated against her for engaging in this protected speech.  She alleges that she was subject to the following three adverse employment actions: (1) she "had an anxiety attack for which she went to the

7

hospital after she objected to allowing Fitzgerald to take the poll books home," (2) she received a reprimand for making the Press Statements to the *Chronicle*, and (3) she received an "Employee Discipline Notice in retaliation for all three incidents of protected speech concerning public matters identified above." (*Id.* at 29, Pg. ID 1446.)

### B.   Krycia

Krycia alleges that she engaged in protected conduct when she attempted to exercise her First Amendment right to refrain from speaking. She claims that she sought to refrain from speaking on two occasions – (1) when Fitzgerald directed her to sign a memorandum disavowing Newell's comments to the *Chronicle* and (2) when Fitzgerald directed her to sign a letter denying any knowledge of the information reported in an article about Fitzgerald that appeared in the *Macomb Daily*. Krycia acknowledges that she signed both of these documents, but she insists that she did so only because Fitzgerald bullied her into doing so.

Krycia alleges that as a result of Fitzgerald's conduct, she suffered stress, anxiety, panic attacks, and insomnia. Krycia also claims that she was reprimanded by a Deputy Clerk for the article that appeared in the *Macomb Daily*. Krycia alleges that her mental suffering and the write-up were adverse actions taken against her for engaging in the allegedly-protected conduct identified above.

8

## **THE R&R**

### **A.    Newell's Claim**

The Magistrate Judge recommended that the Court grant summary judgment to the Defendants on Newell's retaliation claim on two grounds.   First, the Magistrate Judge determined that Newell did not engage in any protected conduct. More specifically, the Magistrate Judge concluded that Newell's statements at issue – the Poll Book Opposition, the Recommendation Letter Opposition, and the Press Statements – were not protected under the First Amendment because Newell made the statements "pursuant to her official duties as Election Coordinator." (R&R, ECF #72 at 16-18, Pg. ID 1791-93.)    Second, the Magistrate Judge determined that Newell was not subject to any adverse action because "she was not discharged, demoted or suspended and she did not lose responsibilities, pay, or benefits." (*Id.* at 21, Pg. ID 1796.)

### **B.    Krycia's Claim**

The Magistrate Judge recommended that the Court grant Defendants summary judgment on Krycia's retaliation claim because she did not engage in protected conduct and was not subject to any adverse action.   Specifically, the Magistrate Judge concluded that:

> Although Krycia is correct that the First Amendment protects the ability to refrain from speech, *Langford v. Lane*, 921 F.2d 677 (6th Cir. 1991), Krycia did not refrain from speech; she acquiesced in her supervisor's

direct orders to prepare and/or sign both the memo disavowing involvement in Newell's comments to the *Chronicle*, and the letter denying any knowledge of the information relayed in the *Macomb Daily* articles.

***

Similarly, Krycia has not presented evidence of any adverse action by her employer. Krycia was never disciplined, suspended or demoted and her duties, pay, and benefits were never reduced.

(*Id.* at 19, 23, Pg. ID 1794, 1798.)

## **PLAINTIFFS' OBJECTIONS**

Plaintiffs have made the following objections to the R&R:

1. Newell objects that the Magistrate Judge "disregarded the applicable legal standard for determining whether [her] statements were protected under the First Amendment because she made them as a 'citizen' about matters of public concern that she became aware of while employed as Defendant Township's Elections Coordinator." (Objections, ECF #73 at 3, Pg. ID 1804.) Newell insists that the Magistrate Judge should have determined that her three statements were protected because her "speech on [the] issues [addressed in the statements] was not ordinarily within her job duties." (*Id.* at 7, Pg. ID 7.)

2. Krycia objects that the Magistrate Judge "disregarded the applicable legal standard used to determine whether Krycia's First Amendment right to refrain from signing letters regarding lack of knowledge of Newell's

comments to the *Chronicle* and the accounts of Fitzgerald's bullying that was the subject of *Macomb Daily* articles was protected speech she made as a 'citizen' concerning matters of public concern."  (*Id.* at 9, Pg. ID 1810.)  Krycia argues that the Magistrate Judge "failed to consider that Fitzgerald's threats and bullying overrode Krycia's attempts to exercise her First Amendment right to refrain from 'acquiescing' to his direct orders to sign these letters." (*Id.* at 9-10, Pg. ID 1810-11.)

3. Both Plaintiffs object that the Magistrate Judge "disregarded the correct legal standard used to determine whether Plaintiffs suffered adverse employment actions as a result of their protected speech."  (*Id.* at 12, Pg. ID 1813.)  Plaintiffs contend that the Magistrate Judge failed to view the adverse action evidence in the light most favorable to them and "failed to analyze whether a reasonable individual would have been dissuaded from engaging in protected activity . . . as required under *Benison v. Ross*, 765 F.3d 649 ([6th Cir.] 2014)."  (*Id.* at 13, Pg. ID 1814.)

## **GOVERNING LEGAL STANDARD**

This Court reviews *de novo* the portions of the R&R to which the parties have objected.  *See* Fed. R. Civ. P. 72(b)(3).

A movant is entitled to summary judgment when it "shows that there is no genuine display as to any material fact . . . ."  *SEC v. Sierra Brokerage Servs., Inc.*,

712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Id.*  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]."  *Anderson*, 477 U.S. at 252.  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Id.* at 251-52.  Indeed, "[c]redibility determinations, the weighing of the evidence and the drafting of legitimate inferences from the facts are jury functions, not those of a judge . . . ."  *Id.* at 255.

## FIRST AMENDMENT FRAMEWORK

To prevail on a First Amendment retaliation claim, a public employee must establish three elements.  *First*, the employee must show that he or she engaged in constitutionally protected speech or conduct.  *See Benison*, 765 F.3d at 658 (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294-95 (6th Cir. 2012)).  A public employee's speech qualifies for First Amendment protection only if, among other things, the employee speaks "as a citizen" on "matters of public concern." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542-44 (6th Cir.

12

2007). More specifically, a public employee's speech or conduct must satisfy all

of the following requirements in order to qualify for protection:

> [1] *The "matters of public concern" requirement*. The First Amendment protects the speech of employees only when it involves "matters of public concern." *Connick v. Myers*, 461 U.S. 138, 143 (1983). In *Connick* . . . the Court explained that not all employee speech is protected, only speech that "fairly [may be] considered as relating to" issues "of political, social, or other concern to the community." *Id.* at 146. . . . When, by contrast, an employee's speech does not relate to a matter of public concern, public officials enjoy "wide latitude" in responding to it without "intrusive oversight by the judiciary in the name of the First Amendment." *Id.*

> [2] *The "balancing" requirement*. If the employee establishes that her speech touches "matters of public concern," a balancing test determines whether the employee or the employer wins. *See Pickering [v. Board of Education]*, 391 U.S. [563,] 568 [(1968)]. . . . In resolving the claim, the Court "balance[d] . . . the interests of the teacher, as a citizen, in commenting on matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." [*Id.*]

> * * * * *

> [3] *The "pursuant to" requirement*. In the last case in the trilogy, a prosecutor reviewed a private complaint that a police officer's affidavit used to obtain a search warrant contained several misrepresentations. *Garcetti [v. Ceballos ]*, 547 U.S. [410,] 413–14 [(2006)]. . . . In rejecting [the public employee's] free-speech claim, the Court did not deny that the prosecutor's speech related to a matter of "public concern" under *Connick*, and it did not take on the lower court's reasoning that *Pickering* balancing favored the employee. It instead concluded that the First Amendment did not apply. "The controlling factor," the Court reasoned, "is that his

13

> expressions were made pursuant to his duties as a calendar deputy," making the relevant speaker the government entity, not the individual. *Id.* at 421 . . . . "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*
>
> \* \* \* \* \*
>
> A First Amendment claimant must satisfy each of these requirements: the *Connick* "matter of public concern" requirement, the *Pickering* "balancing" requirement and the *Garcetti* "pursuant to" requirement.

*Evans–Marshall v. Bd of Educ. of Tipp Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337-38 (6th Cir. 2010).

*Second*, the public employee must show that her employer took an adverse action against her "that would deter a person of ordinary firmness from continuing to engage in that lawful conduct." *Benison*, 765 F.3d at 658. This adverse action test "is 'distinct' from the adverse-action standard used in traditional employment discrimination claims," and thus a federal court must "tailor [its] analysis under the adverse action prong to the circumstances of [the] specific retaliation claim." *Id.* at 659.

*Third* (and finally), a public employee must demonstrate a causal connection between the constitutionally protected speech or conduct and the employer's adverse action – "that is, the adverse action was motivated at least in part by [the] protected conduct." *Id.* To show causation, "the employee must point to

14

"'specific, nonconclusory allegations' reasonably linking her speech to employer discipline." *Bailey v. Floyd Cty. Bd. of Educ. By & Through Towler*, 106 F.3d 135, 144-45 (6th Cir. 1997) (quoting *Wright v. Illinois Dep't of Children & Family Servs.,* 40 F.3d 1492, 1500 (7th Cir.1994)). An employee may not establish causation by pointing to "the mere fact that an adverse employment action followed speech that the employer would have liked to prevent." *Id.*

## ANALYSIS

**A.   The Magistrate Judge Correctly Concluded That the Defendants Were Entitled to Summary Judgment on Newell's Retaliation Claim**

As noted above, Newell's claim is based upon alleged retaliation for three statements: the Poll Book Opposition, the Recommendation Letter Opposition, and the Press Statements.   The Magistrate Judge Correctly concluded that Newell's claims with respect to these statements fail as a matter of law.   The Court therefore overrules Newell's objections to the R&R.

### 1.   The Poll Book Opposition

Newell's claim based on the Poll Book Opposition fails because Newell made the objection pursuant to her employment duties, not as a public citizen.   Her own Complaint in this action makes that clear.   Newell alleges:

> 13.   As an Elections Coordinator, *Newell was generally responsible for* coordinating and directing the personnel of the Township's Elections Division to carry out the statutory voter registration and election responsibilities of the Township Clerk, as

15

> well as *ensuring that all election activities were handled in accordance with established procedures, rules, regulations, and laws.*
>
> * * * * *
>
> 17. *Newell advised Fitzgerald that it was against State law* to take the laptops home and that they must be locked in a vault to avoid tampering prior to pickup for the election.

(Compl., ECF #1 at Pg. ID 3; emphasis added.)  Likewise, when Newell opposed the Defendants' Motions, she stressed that she was upholding her oath of office when she engaged in the Poll Book Opposition.[1]  Simply put, Newell's job required her to enforce and apply state elections law, and that is precisely what she did when she raised the Poll Book Opposition.  Notably, Newell has not cited any evidence that the Poll Book Opposition fell outside of her normal duties as Elections Coordinator.

On this record, the Magistrate Judge correctly concluded that Newell raised the Poll Book Opposition pursuant to her official duties; that she was thus not

---

[1] In her opposition to the Motions, Newell highlighted her own deposition testimony that she was carrying out her oath of office when she made the objection: "Newell explained that this information [in the poll books] is private information and that election employees take an oath before each election not to give this information to anyone." (Pls.' Response Br., ECF #42 at 6, Pg. ID 1423; *see also* Newell Dep., ECF #35-3 at 93, Pg. ID 264 (acknowledging that she made the objection pursuant to her oath).)  Newell said that her oath required her to resist Fitzgerald's effort to remove the poll books from the Clerks' Office because removing them would risk exposing the private information in the books to Fitzgerald's wife, who was not a Clerk's Office employee.  (*See* Pls.' Response Br., ECF #42 at 7, Pg. ID 1424.)

speaking "as a citizen" when she engaged in the Poll Book Opposition; and that the Poll Book Opposition may not be the basis of a First Amendment retaliation claim. *See Weisbarth*, 499 F.3d at 546 (affirming dismissal of First Amendment retaliation claim where plaintiff spoke pursuant to job duties rather than "as a citizen.").

### 2.    The Press Statements

Newell's claim based upon the Press Statements fails because she did not intend to make the statements "as a citizen." *Weisbarth*, 499 F.3d at 542-44. Her own testimony confirms the point. Newell testified that she spoke to the reporter from the *Chronicle* because the Clerk and Deputy Clerk would not do so. (*See* Newell Dep., ECF #35-3 at 123-26, Pg. ID 271-72.) Newell explained that she believed an office "protocol" called for her to respond to press inquiries under these circumstances. Under that protocol (as understood by Newell), "if the Clerk or Deputy Clerk did not speak with the press, the Election Coordinator did." (*Id.* at 126, Pg. ID 272.) Thus, at the time Newell spoke to the *Chronicle*, she believed that she was executing the office "protocol" with respect to press inquiries. That is far different from intending to speak as a private citizen. Because Newell believed that she was executing her job responsibilities when she made the Press

17

Statements, her speech cannot be regarded as the speech of a "citizen" that is subject to First Amendment protection.[2]

Newell's claim based on the Press Statements fails for one additional reason: she cannot satisfy the *Pickering* balancing test. *See Fitzpatrick v. City of Frankfort*, 305 Fed. App'x 258, 263-64 (6th Cir. 2008) (affirming dismissal of First Amendment retaliation claim against public employer because employer's interest in prohibiting speech outweighed employee's interest in speaking). The Defendants' interest in preventing Newell from making those statements outweighed any personal interest she may have had in making them.

When conducting the *Pickering* balancing test, the Court considers whether "an employee's comments meaningfully interfere with the performance of her duties, *undermine a legitimate goal or mission of the employer*, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky*, 24

---

[2] The Defendants insist that the "protocol" had been replaced with a policy prohibiting employees like Newell from answering press inquiries and that the new policy had been communicated to all employees. (*See* Fitzgerald Dep., ECF #37-6 at 17-18, Pg. ID 671.)   Newell says that that prohibition had not been communicated to her by the time she spoke with the *Chronicle* and that she believed that the prior "protocol" (described above) was in place. (*See* Newell Dep., ECF #35-3 at 122-23, Pg. ID 271.)   But the dispute over whether the new policy had been communicated to Newell (or whether it was even in place) does not preclude summary judgment in favor of Defendants.   The key fact with respect to summary judgment is that Newell believed she was executing the "protocol" when she spoke to the *Chronicle*.   That belief is inconsistent with any claim that Newell intended to speak as a private citizen.

F.3d 1526, 1536 (6th Cir. 1994) (emphasis added). Here, the Clerk's Office had a legitimate goal of "speaking in a single, consistent voice." *Rock v. Levinski*, 791 F.3d 1215, 1222 (10th Cir. 2015) (recognizing that a public body has a valid interest in controlling the dissemination of its own message). To achieve that goal, Fitzgerald implemented a policy designating himself as the sole person in the office who was authorized to speak with the press. (Fitzgerald Dep., ECF #37-6 at 11-18, Pg. ID 669-72.)[3] Fitzgerald explained that as the person at the top of the "chain of command," he was in the position to give the "best answer" on behalf of the Clerk's Office, and by having public communications go exclusively through him, he could assure that information was not prematurely revealed to the press and public. (*Id.* at 11-15, Pg. ID 669-70.) Newell agreed that the Clerk's Office had a legitimate interest in communicating its message to the public through a single voice. (Newell Dep., ECF #35-3 at 127, Pg. ID 272.) The Press Statements by Newell – made in response to a media inquiry to the Clerk's Office during normal business hours seeking a comment from the Office – undermined the Defendants' legitimate interest in ensuring that the official message of the Clerk's

---

[3] As noted above, in footnote two, Newell says that she was not aware of this new policy and that she believed that the office was operating under the prior "protocol" – the one that authorized her to speak to the press in the absence of her superiors. But Newell's claimed lack of knowledge does not in any way undermine the Clerk's Office's legitimate interest in having Fitzgerald serve as its sole spokesperson.

Office was disseminated through a single source.[4]   (Fitzgerald Dep., ECF #37-6 at 11-18, Pg. ID 669-72.)

On the other side of the ledger, Newell has implicitly acknowledged that she had *no* personal interest in making the Press Statements.   In fact, she asked the reporter *not* to print her statements because she had not cleared her statements with Fitzgerald.   (*See* Newell Dep., ECF #35-3 at 124, Pg. ID 271.)   Under these circumstances, the Defendants' legitimate interest in prohibiting those statements (and taking action against Newell for making them) outweighs any First Amendment interest that Newell may have had in making the statements.   Newell's First Amendment retaliation claim based on the Press Statements fails for this additional reason.

### 3.   The Recommendation Letter Opposition

The   Magistrate   Judge   concluded   that   the   Recommendation   Letter Opposition was "an articulation of Newell's disagreement with her boss' directive,

---

[4] At the hearing before the Court, Plaintiffs' counsel highlighted that Fitzgerald did not take issue with the content of Newell's statements to the press. (*See* Fitzgerald Dep., ECF #37-6 at 13, 17 Pg. ID 670, 671.)   Counsel argued that because Fitzgerald did not identify an objection to the content of the statements, Defendants should not be heard to argue that the statements materially interfered with the operations or mission of the Clerk's Office.   The Court disagrees.   The relevant interest of the Clerk's Office is having a single speaker deliver its message, and a statement by an unauthorized speaker undermines that legitimate interest even if the content express by the unauthorized speaker happens to be consistent with what the authorized speaker would have said.

and thus owe[s its] existence to her professional responsibilities." (R&R, ECF #72 at 16, Pg. ID 1791.)  Based on his conclusion that the Recommendation Letter Opposition grew out of Newell's job duties, he concluded that it did not amount to protected speech. (*Id.*)

Newell argues in her Objections that the Magistrate Judge's conclusion cannot be reconciled with the Sixth Circuit's decision in *Rodgers v. Banks*, 344 F.3d 587 (6th Cir. 2003). In *Rodgers*, the Sixth Circuit reversed the dismissal of a First Amendment retaliation claim brought by a hospital's Director of Quality Management. The plaintiff claimed that she had been discharged for complaining to a superior that patient privacy was being sacrificed by a certain practice. The Sixth Circuit held that the plaintiff's complaint about the privacy issues did amount to protected speech because it addressed a matter of public concern. The Sixth Circuit specifically rejected the defendants' argument that the complaints were not protected speech because the plaintiff made them during the course of performing her duties. Newell says that *Rodgers* required the Magistrate Judge to "consider[] the point or focus of the speech in question and whether it related to any matter of political, social, or other concern to the community." (Objections, ECF #73 at 8, Pg. ID 1809.)  Newell insists that the Recommendation Letter Opposition constitutes protected speech under *Rodgers* because it related to matters of public

concern – namely, whether Fitzgerald's wife was qualified for an Elections Coordinator position in another municipality. (*Id.*)

Newell's reliance on *Rodgers* is misplaced. "Several recent Sixth Circuit cases" – including *Weisbarth, supra*, and *Fox v. Traverse City Area Bd. of Public Schools*, 605 F.3d 345 (6th Cir. 2010) – "suggest that the *Rodgers* rationale would not survive [the Supreme Court's more recent decision in] *Garcetti*." *Hilden v. Hurley Med. Ctr.*, 831 F. Supp. 2d 1024, 1038 (E.D. Mich. 2011), *aff'd,* 504 Fed. App'x 408 (6th Cir. 2012). More specifically, *Rodgers*' holding that the plaintiff's complaints were protected speech even though she lodged those complaints pursuant to her duties as Director of Quality Management is not consistent with *Garcetti*. Given the questionable vitality of *Rodgers*, it does not compel the conclusion that the Recommendation Letter Opposition was protected speech.

The Court agrees with the Magistrate Judge that Newell did not make the Recommendation Letter Opposition as a citizen and that the objection thus does not constitute protected speech. When Fitzgerald asked Newell to sign the recommendation letter, he was asking Newell to take action *in her official capacity* as Elections Coordinator – to affix her name to a letter *on official office letterhead.* (*See* Newell Dep., ECF #35-3 at 135, Pg. ID 274.) Newell did not believe that it was appropriate, in her capacity as Elections Coordinator, to provide an official reference for an unqualified candidate and she initially (and temporarily) objected

22

to signing the letter (before later changing her mind).  Newell's initial refusal to sign the letter was thus a professional disagreement with her superior about the proper performance and scope of her official duties as Elections Coordinator. Under these circumstances, Newell was speaking as a public employee, not as a private citizen, when she declined to sign the letter.  Thus, Newell's claim based upon the Recommendation Letter Opposition cannot succeed.

The claim based upon the Recommendation Letter Opposition also fails because Newell has failed to satisfy the causation element of her prima facie case. She has not presented sufficient evidence that either of the Defendants took any adverse action against her because (for a short period of time) she refused to sign the letter.  Newell identifies only one adverse action that occurred after the she raised her concerns about the letter: she received an Employee Discipline Notice on August 17, 2011 (the "EDN").  (*See* Objections, ECF #73 at 13-14, Pg. ID 1814-15.)  But the only link between the Recommendation Letter Opposition and the EDN is temporal proximity.  That is, Newell has shown only that the EDN was issued five weeks after she expressed her discomfort with signing the letter. Newell has not identified any evidence that either of the Defendants considered (or even mentioned) her initial refusal to sign the letter during the proceedings leading up to and/or in connection with the EDN.  Under these circumstances, Newell's evidence of temporal proximity, standing alone, is insufficient to make out a prima

23

facie case of causation. *See Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001) (affirming summary judgment on First Amendment retaliation claim where plaintiff's sole evidence of causation was temporal proximity).

Moreover, Newell's theory that the Defendants issued the EDN in response to the Recommendation Letter Opposition is somewhat counterintuitive. Newell voiced her concerns about the letter only briefly, and then she gave Fitzgerald exactly what he was asking for: she signed the letter recommending his wife. On this record, it is too much of a stretch to conclude that after Fitzgerald got exactly what he was looking for (i.e., Newell's signature on the letter), Fitzgerald (or the Township) then retaliated against Newell because she briefly voiced an objection to signing the letter.

For all of these reasons, the Court concludes that the Magistrate Judge properly recommended that the Court enter summary judgment against Newell on her claim arising out of the Recommendation Letter Opposition. Newell's Objections to the R&R are therefore overruled.

**B.    The Magistrate Judge Correctly Concluded That the Defendants Are Entitled to Summary Judgment on Krycia's Retaliation Claim**

The Magistrate Judge concluded that Krycia cannot prevail on her retaliation claim because (1) she did not engage in protected conduct and (2) she failed to show that the Defendants took any adverse action against her based upon her allegedly-protected conduct. As described above, Krycia has objected to both

24

conclusions.  The Court agrees with the Magistrate Judge that Krycia has failed to establish the causation element of her claim and that the Defendants are thus entitled to summary judgment.  The Court does not reach the question the question of whether Krycia engaged in protected conduct.

In the context of a First Amendment retaliation claim, causation requires that "the defendant must have known about the protected activity in order for it to have motivated the adverse action."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 386-87 n.3 (6th Cir. 1999).  When the Court held a hearing on her Objections, Krycia acknowledged that she had to satisfy this requirement.  But Krycia has not presented any evidence that either of the Defendants knew about her allegedly-protected conduct.  The protected conduct that Krycia identifies in this case is the right to refrain from speaking.  (*See* Objections, ECF #73 at 9-10, Pg. ID 1810-11.) Krycia says that she attempted to exercise this right when Fitzgerald asked her to sign a memo dated May 13, 2011, and a letter that appeared in the *Macomb Daily* in November 2011.  (*Id.* at 10-11, Pg. ID 1811-12.)  She insists that Fitzgerald bullied her in to signing both documents despite her desire not to sign.

The problem for Krycia is that she never expressed to Fitzgerald or anyone else that she did not want to sign the documents.  Instead, she kept that thought entirely to herself (and Krycia did not exercise the right to refuse from speaking by *actually* refusing to sign the documents).  Thus, neither Fitzgerald nor any

representative of the Township knew (or could have known) that Krycia had any intent to engage in the protected conduct of refraining from speaking. Without such knowledge, they could not have retaliated against her for attempting to exercise that right. Accordingly, because Krycia cannot satisfy the causation element of her prima facie case, the Court overrules her Objections and adopts the Magistrate Judge's recommendation that her claim should be dismissed for that reason.

## **CONCLUSION**

For the reasons stated in this Opinion and Order, **IT IS HEREBY ORDERED** that the Court:

- **OVERRULES** Plaintiffs' Objections (ECF #73);

- **ADOPTS** those portions of the R&R cited with approval above (ECF #72);

- **GRANTS** Defendants' Motions for Summary Judgment (ECF ## 35, 37).

**IT IS SO ORDERED.**

s/Matthew F. Leitman<br>
MATTHEW F. LEITMAN<br>
UNITED STATES DISTRICT JUDGE

Dated: February 26, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 26, 2016, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113